**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANTON EATON,

        Plaintiff,

    v.

WALMART, INC.,

        Defendant.

No. 22 CV 1592

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Anton Eaton was a dental hygienist at Walmart. He had conflicts with some of his co-workers, and he made complaints of racial discrimination and harassment and filed an EEOC charge alleging that his supervisor had discriminated against him on the basis of race. During the course of his employment at Walmart, Eaton's mental health deteriorated, and he regularly came to work late and sent troubling texts to his co-workers. Things came to a head when Eaton was injured, instructed not to come to work, and came to work anyway; Eaton was ultimately fired for his tardiness and behavior at work. Eaton brings this suit with claims against Walmart for racial discrimination, harassment, retaliatory harassment, retaliation, and retaliatory discharge. Walmart's motion for summary judgment is granted. There is no issue of material fact as to the reason for Eaton's firing, the alleged harassment did not constitute a hostile work environment or was not related to race, and Eaton cannot establish the kind of adverse action or causation he would need to prevail on his retaliation theories.

## I.    Legal Standards

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024). A reviewing court views the record in the light most favorable to the non-movant and does "not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Runkel v. City of Springfield*, 51 F.4th 736, 741–42 (7th Cir. 2022) (citation omitted). At summary judgment, "a party must reveal what evidence it has to convince a jury … This means a party may not manufacture a genuine issue of material fact by speculating about evidence not in the record." *Ellison v. United States Postal Service*, 84 F.4th 750, 759 (7th Cir. 2023) (citation omitted).

## II.    Facts

Walmart hired Eaton, an African American man, in December 2020 as a full-time dental hygienist. [50] ¶ 1.[1] Eaton's supervisor was Phyllis Friedrich and then

---

[1] Bracketed entries refer to entries on the district court docket. Referenced page numbers are taken from CM/ECF header placed at the top of filings. The facts are taken from the parties' responses to Local Rule 56.1 statements of facts in which both the asserted fact and response are included in one document. [50] (and [49]) and [57]. Plaintiff continued the numbering from Defendant's statement of facts starting his facts with paragraph 66 and I adopt his numbering. *See* [57] ¶¶ 66–78. The parties dispute many statements, and when material I note those disputes in the body of the opinion or resolve the objection in a footnote. Finally, I disregard statements that are irrelevant to the resolution of the motion. [50] ¶¶ 16, 28, 49, 57, 65; [57] ¶ 78.

Dan Czwornog. [50] ¶ 2. Eaton completed training on Walmart's discrimination and harassment prevention policy, open-door communications policy, and progressive disciplinary policy. [50] ¶¶ 3–4. If an employee received more than one disciplinary occurrence in twelve months then each occurrence would be coded more seriously, from DA1-Yellow to DA3-Red, after which he would be subject to termination. [50] ¶ 4. Eaton was also trained on Walmart's attendance policy, which was a point-based system that allocated points for tardiness and unauthorized absences. [50] ¶ 5. Finally, Eaton received Walmart's Violence-Free Workplace Policy, which he understood to prohibit any "forms of violence, threats of violence, confrontations, hostility of any kind." [50] ¶ 6.

## A.     Initial Complaints and First Disciplinary Action

In February 2021, Eaton submitted a complaint about his then-supervisor Friedrich. [50] ¶ 21. Eaton had been provided misinformation about his medical benefits, which were not immediately available, and when Eaton discussed some of his medical bills, Friedrich asked him to "investigate options of getting on welfare," which Eaton felt was inappropriate because he is African American. [50] ¶ 21; [57] ¶ 74.[2] Stacey Webb, the Walmart Heath Market Director above Friedrich,

---

[2] Eaton had to go to the hospital after taking amoxicillin as prescribed by a doctor at the Walmart clinic; he had understood from Walmart that his health benefits would start immediately, so he did not sign up for COBRA insurance from his previous employer. [57] ¶¶ 72–73. Eaton's benefits were not in place at that time, so Eaton had large bills from the hospital visit. [50] ¶ 21. Defendant's objections to ¶¶ 72–73 for being unsupported by evidence are overruled; Eaton has personal knowledge of the facts contained in those paragraphs, and I construe his pro se filing like a testimonial affidavit for purposes of summary judgment. In any event, these facts are not material to the resolution of this motion.

investigated Eaton's complaint. [50] ¶ 22.[3] Friedrich denied directing Eaton to investigate "welfare" options but said she had suggested Eaton look into Medicaid as a possible solution for the 90-day waiting period for his medical benefits. *Id*.[4] Walmart counseled Friedrich about the comment. [50] ¶ 23.

On April 15, 2021, Eaton was given a first-step disciplinary action (DA1-Yellow). [50] ¶ 7. Walmart asserts that it was for not taking his lunch break as scheduled, but Eaton points out that the document lists "break and meal periods" and "insubordination." *Id*. Eaton challenged the disciplinary action. [50] ¶ 8.[5] Walmart asserts that Eaton did not raise any race-based allegations in his dispute but Eaton states that in later conversations with management about the April incident he did state that he felt the disciplinary action was racially motivated. [50] ¶ 9; *see* [41] at 150. Another Walmart associate, who identifies as Latina, was also disciplined for an attendance issue on the same day. [50] ¶ 10.

Eaton reported that Friedrich had retaliated against him for his February 2021 complaint by issuing him a step one disciplinary action that was unjustified. [50]

---

[3] Webb was the operations director for the Chicago centers and Eaton understood that she was the top of the supervisory chain for his workplace. [57] ¶ 70.

[4] Eaton argues that Medicaid is a form of welfare, so Friedrich's denial is meaningless. *See* [50] ¶ 22. I agree that Medicaid is a form of state aid to people with low income and acknowledge that the connotation of the word "welfare" is different than the connotation of the term "Medicaid." The parties dispute whether Friedrich used "welfare" or "Medicaid."

[5] Eaton's objection to ¶ 8 is sustained as to the second clause of the sentence because the cited material does not support the assertion that Eaton admitted he did not have permission from the assistant dental administrator. *See* [50] ¶ 8; [41] at 103–112. The first clause is supported by the cited material and admitted.

4

¶¶ 24–25.[6] Walmart investigated Eaton's report and determined that his retaliation claim was unsubstantiated. [50] ¶ 27. Eaton disagrees with the integrity of the investigation. *Id*.

Eaton filed a charge of discrimination with the EEOC in July 2021 stating that he was subjected to racial harassment, and that after he complained he was disciplined. [50] ¶¶ 29–30. Eaton said he had "been discriminated against because of [his] race, Black, and in retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964"; Eaton did not check the retaliation box on the Charge. [50] ¶¶ 31–32. Eaton testified that he based the Charge on Friedrich's welfare comment and a time when she told Eaton that she was "so sorry about slavery [and] what happened to you guys," after visiting the African American History Museum. [50] ¶¶ 33–34.

## B. Eaton's Complaints of Bullying and Second Disciplinary Action

On October 9, 2021, Eaton arrived to work four hours late, causing two patients to be rescheduled. [50] ¶ 11.[7] In early November, Walmart issued Eaton a step two disciplinary action (DA2-Orange) for "Attendance/Punctuality" based on his late arrival on October 9th. [50] ¶ 12; [41] at 114; [57] ¶ 69. Eaton admitted he was late but disagreed with the disciplinary action's use of the term "no-call, no-show," and

---

[6] Eaton states that he had not been told there was a policy preventing him from taking late lunch breaks, he had been doing so since he began at Walmart, and that once his supervisor told him he had to take his lunch at noon, he agreed to do so. *See* [50] ¶ 26; [41] at 112.

[7] Eaton disputes that two patients were rescheduled arguing that only one was rescheduled, but the documents he cites do not establish that only one was rescheduled. *See* [50] ¶ 11; [41] at 114, 117.

objected to having the disciplinary action follow-up conversation with supervisors who he believed had harassed him. [41] at 33 (106:9–13); [50] ¶¶ 11, 13.

Eaton complained to Webb about how an assistant center administrator and dentist were treating him, including that the two were harassing him. [57] ¶ 67. In late October 2021, Eaton sent a text to Czwornog, Webb, and another manager stating that he was overwhelmed by "the racism, the intimidation, the harassment," he was "breaking down hard and fast," and "This [is] my cry out for help." [50] ¶ 43; [41] at 153–54. These texts prompted Webb to contact Eaton via telephone and ultimately call the police to ask for a wellbeing check on Eaton. [50] ¶ 44; [57] ¶ 68. Eaton denies that he made any threats of suicide during the conversation with Webb. *See* [50] ¶¶ 43–44.

On November 10, 2021, Eaton made a formal complaint that the supervising dentist and assistant center administrator, both of whom are African American, were bullying him, had created a hostile work environment, and engaged in retaliation. [50] ¶ 35. In his complaint, he did not mention that either had made comments relating to race. [50] ¶ 36.[8] In late December, Eaton made another complaint via email in which he outlined instances in which he felt that the dentist had been rude, unprofessional, and forced Eaton to work as a dentist in violation of the law. [57]

---

[8] Eaton agrees that he did not mention race in his November 2021 complaint but asserts that "the allegations were based on a broader context of white management using African American colleagues to create a hostile work environment." *See* [50] ¶ 36. Eaton cites to a page from Eaton's February 2021 internal complaint about lack of personal protective equipment and mentions Friedrich's comment about investigating welfare to cover medical bills. *See* [41] at 124. The evidence cited does not show a connection between Friedrich and the two individuals mentioned in the November 2021 complaint.

¶¶ 75–76; [50] ¶¶ 37–38. In his email, Eaton wrote that the dentist's behavior put his license at risk. [57] ¶ 75; [52-1] at 15.

Czwornog investigated Eaton's complaints and found them unsubstantiated, in part because neither employee had issued Eaton discipline. [50] ¶ 39. Eaton disputes the integrity of the investigation and states that the lack of formal discipline does not mean the individuals did not create a hostile work environment for him; Eaton asserts that the two were doing so at the behest of white supervisors. *See* [50] ¶ 39. Despite making formal complaints about the two employees, Eaton had to work with the individuals. [57] ¶ 71.[9] Eaton's paycheck was going to be short for the week of January 20, 2022, but Czwornog resolved the error after Eaton brought it to his attention. [50] ¶ 40. Eaton believed that the paycheck was made short in retaliation for his complaints about the dentist; he asserted that Czwornog told him the issue was from a "higher power" and believed that referred to Webb. [41] at 48 (167:16–168:16).

## C. Eaton's Third Disciplinary Action

In January 2022, Eaton texted a group work chat saying his therapist had recommended he get a psychological evaluation and that he needed to focus on his mental and emotional health. [50] ¶ 42.[10] Eaton then forwarded a text he had sent to

---

[9] Walmart states that the evidence does not support Eaton's assertion about having to work more closely with the individuals after submitting complaints about them. [57] ¶ 71. The document supports the assertion that despite his complaints he still had to work with the dentist, *see* [52-1] at 15–16, but not that he was directed to work *more* closely with either of them. I rely on the facts as supported by the evidence in the record.

[10] Walmart asserts that it in January 2022, it began an investigation into whether Plaintiff was fit to serve, but none of the cited materials support that assertion. [50] ¶ 41. The cited

a colleague in which he disclosed that he was overwhelmed and felt like he needed to get a psychological evaluation and thanked his colleague for checking on him. *Id.*

On January 18, 2022, Walmart issued Eaton a step three disciplinary action (DA3-Red) for attendance and punctuality issues from November 9, 2021, to January 18, 2022. [50] ¶ 14. Eaton was subject to Walmart's attendance policy for associates. [50] ¶ 17. Walmart asserts that Eaton was late 23 times out of 36 scheduled shifts in that time period. [50] ¶ 15. Eaton states that according to Walmart's grace period policy and a prior agreement with management to adjust his schedule, he was only late eight times. *Id.* Because the parties dispute whether Eaton was late or arrived within the grace period, they dispute whether the January 2022 disciplinary action was compliant with Walmart's attendance policy. *See* [50] ¶ 18. Eaton did not appeal the discipline and he admitted to his supervisor that he understood it was against Walmart's policy to arrive late to work and that the next step in disciplinary action would make him subject to termination. [50] ¶¶ 19–20.

### D. Eaton's Termination

On February 1, 2022, Eaton came to work with his arm in a sling and said that he had shot himself in his hand. [50] ¶ 45.[11] Eaton emailed Webb and Czwornog on the same day stating, "As instructed, I went to Sedgwick [Walmart's third-party

---

deposition testimony is about the texts that Eaton sent to work colleagues and the cited documents are screenshots of the texts themselves. [41] at 53 (187:4–13); [41] at 146–47.

[11] Eaton disputes that he told anyone at work that the wound was self-inflicted, but at his deposition, he testified "And then they asked me what happened. And I said, you know what, I shot myself in the hand. And that was it. They didn't ask any questions." *See* [50] ¶ 45; [41] at 57 (202:20–21). Eaton's objection is overruled.

benefits administrator] to see what's to the process. Sedgwick is a process for requesting time off. I am not yet requesting time off." [41] at 157; [50] ¶ 46. Eaton mentioned that another hygienist who had a hand injury was able to work a full-time schedule and was not asked to take a leave of absence. [50] ¶ 48; [41] at 57. He concluded the email by stating that his leave and work-related tasks would be dictated by his surgeon. [50] ¶ 47.

On February 2, 2022, an anonymous caller contacted Walmart's Ethics Hotline to report that "an associate that works in the on-site dental office has made concerning statements regarding shooting people. The associate claims to have a conceal carry permit and the caller is concerned that the associate will bring a weapon to the store." [50] ¶ 51; [41] at 159–60.[12] The caller didn't name the associate, although the reported store address was the one Eaton worked at. [41] at 159–60. Webb expressed concern about the caller's report in light of Eaton's arrival at work the day before with a gunshot wound. [41] at 159. Eaton states that he never made any statements about shooting people. [50] ¶ 51.

That same day, a Walmart investigation determined that Eaton was an elevated risk to commit violence at the store "based on his comments about shooting people outside of work and his account of accidentally shooting himself" and noted that Eaton had reported multiple conflicts with his supervisors. [50] ¶ 52. Eaton

---

[12] Eaton objects to the report of the call as inadmissible hearsay. [50] ¶ 51. His objection is sustained in part, I do not consider the report to be evidence of what Eaton really did or said. Instead, I accept the report as evidence of the issues on Walmart management's mind at the time they made the decision to terminate Eaton.

disputes that he ever posed a risk of committing violence and points out that Walmart does not attach the investigation report itself. *Id.*

The next day, Webb told Eaton not to come to work and report his medical status to Sedgwick. [50] ¶ 53.[13] Eaton went to work but a security guard told him he could not enter; the police were called, they searched Eaton, and escorted him out of the building. [50] ¶ 54; [41] at 63–65 (228:19–229:7, 230:23–232:14, 235:4–8); [56] (Body Worn Camera video at 3:01–11:26). Later the same day, an anonymous caller reported to the Ethics Hotline that Eaton had come to work with a gunshot wound, that Eaton had issues at the store and "things are just escalating." [50] ¶¶ 55–56; [41] at 182.[14] The caller reported that Eaton had said he wanted to sue Walmart due to issues with management and that the caller had concerns about Eaton's health and the safety of associates at work. [50] ¶ 58; [41] at 182. Eaton emailed Walmart HR, Czwornog, and Webb to explain why he had come to work and share that it was embarrassing to discover that the police were called. [50] ¶¶ 59–60. Eaton included some information about his medical diagnosis and condition; HR responded and directed Eaton to work with the "ASC," if he needed a temporary job adjustment. [50]

---

[13] Eaton asserts that he texted Webb that he was in the Uber on his way to work and she texted, "Okay." [50] ¶ 53. But the cited material does not support that assertion because the attached screenshot does not show that exchange. *See* [52-1] at 34.

[14] Eaton objects to ¶ 55 as unsupported by the evidence and hearsay. [50] ¶ 55. Walmart asserts that anonymous caller reported a threat of violence made by Eaton, but the cited material does not support that the caller reported that Eaton made a threat of violence. *See* [41] at 182. That portion of ¶ 55 is struck. I accept the statement from the anonymous caller, not for the truth of the assertion, but for the effect it had on Walmart management. Eaton's objection is sustained in part, overruled in part.

10

¶¶ 61–62.[15] Later on February 3rd, Walmart management made the decision to fire Eaton. [50] ¶ 63.

Walmart fired Eaton on February 4, 2022, for attendance violations, concerning text message communications, workplace violence concerns, and Walmart's threat assessment. [50] ¶ 64.[16] Eaton filed a second charge with the EEOC on February 15, 2022, stating that he had been discriminated against because of his race and disability, and retaliated against for engaging in protected activity. [57] ¶ 66; [52-1] at 2.

## III.  Analysis

### A.  Counts I and II – Discrimination Based on Race

Title VII and § 1981 discrimination claims are generally analyzed in the same manner, with a distinction in the causation element—in Title VII cases the plaintiff must show that his protected status is a "motivating factor" in the employer's decision, but in a § 1981 claim, the plaintiff must show that his protected status is the "but-for cause" of the decision. *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) *citing in part, Comcast Corp. v. Nat'l Ass'n of African American-*

---

[15] Nothing in the material cited by Walmart explains the meaning of "ASC."

[16] Eaton objects to Czwornog's and Webb's declarations because they both describe themselves as employed in positions that they did not hold at the time of Eaton's response. *See* [50] ¶¶ 18, 43–44, 64; [57] ¶ 77. Walmart responds that at the time each executed the declaration they were employed in the position described in the document. [58] at 8. I accept Walmart's representation about Czwornog's and Webb's titles; furthermore, Eaton admits that both were his supervisors and took part in relevant events to this lawsuit. *See, for example,* [50] ¶¶ 2, 5, 20, 22, 43, 53–54. Czwornog and Webb had personal knowledge of Eaton's employment at Walmart and are competent to provide testimony about his employment, including the reasons for his termination. Eaton's objections are overruled.

*Owned Media*, 140 S. Ct. 1009, 1019 (2020). For both claims, the court must consider all of the evidence and determine whether there is a basis for a reasonable factfinder to find that the employer took an adverse action against the employee because of their protected status. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Parties may organize their evidence in the *McDonnell-Douglas* burden-shifting framework in which a plaintiff shows a *prima facie* case of discrimination when he presents evidence that he (i) is a member of a protected class, (ii) was meeting his employer's legitimate expectations, (iii) suffered an adverse employment action, and (iv) a similarly situated employee not of his protected class was treated more favorably. *See Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022). It is undisputed that Eaton is an African American man and that he was terminated from his position at Walmart.

Walmart argues that Eaton was not meeting his employer's legitimate expectations, which was the reason for his termination, and points to Eaton's timeliness, reported concerns about Eaton's behavior, and Walmart's ultimate assessment that Eaton as presenting a threat at the workplace.

### 1. Timeliness

The Walmart Attendance Policy attached to Walmart's motion reflects that being 10 or more minutes late to a scheduled shift time results in .5 points; an unauthorized absence is 1 point, and a "NoCall/No Show," where the employee provides no advance notice, is 2 points in addition to the one point for the

unauthorized absence. [41] at 171–74. If an employee accumulates five or more points in a rolling six-month period, they will be subject to termination. [41] at 172.

Eaton was written up for being four hours late on October 9, 2021. [50] ¶ 11. It is disputed whether this tardiness was counted as a "No Call/No Show." *Id*. Making an inference in favor of Eaton, this was not a "No Call/No Show," because he did come to work, and he did not miss more than 50% of his shift arriving three and half hours late to a ten-and-a-half-hour shift. *See* [41] at 114 (Shift was from 7:30 a.m. to 6:00 p.m. and Eaton arrived at 11:00 a.m.). Reviewing the record in the light most favorable to Eaton, the late arrival on October 9, 2021, was worth 0.5 points under Walmart's attendance policy.

On January 18, 2022, Eaton was issued a disciplinary action for attendance and punctuality issues from November 2021 to January 2022, arriving late 23 times out of 36 scheduled shifts. [50] ¶¶ 14–15. Eaton disputes that he was late on all of those occasions because the Walmart policy states that being "late in" means the employee "clock[s] in 10 or more minutes after the scheduled shift start time" and he was only more than ten minutes late for a shift on eight occasions. *See* [50] ¶ 15; [41] at 174. Eaton attaches a printout of his arrival and departure times and argues there are nine instances when he was more than ten minutes late for a shift; Eaton states that for one of those instances he had received prior permission to be late due to a therapy session. *See* [50] ¶ 15; [52-1] at 7–11.

Walmart's policy is that being "late in" means the employee clocked in *ten or more minutes* after the scheduled start time, so clocking in ten minutes after the start

time is "late in." *See* [41] at 174. Applying that policy to Eaton's timesheet, he was "late in" on eleven occasions from November 19, 2021, to January 18, 2022. *See* [52-1] at 7–11 (November 19, 20, 23, 24, December 8, 9, 14, 17, 21, 27, and January 10). Adding those late instances together, Eaton would have received 5.5 points and at least 0.5 points from the October 9, 2021 late arrival; that totals 6.0 points in a four-and-a-half-month period, which, according to the Walmart attendance policy, is grounds for termination.

Walmart communicated its expectation to Eaton that he arrive promptly for his scheduled shift time and Eaton understood that it was against Walmart policy to arrive late to work. *See* [50] ¶¶ 5, 20. Timeliness was a reasonable expectation of Walmart's that Eaton was failing to meet. *See Contreras v. Suncast Corp.*, 237 F.3d 756, 760–61 (7th Cir. 2001) (attendance is a bona fide expectation, especially when an employer communicates the requirement via rules or policy).

### 2. *Eaton's Behavior at Work*

The parties dispute the facts around Eaton's behavior at work and many of the allegations parried back and forth are quite serious. Looking at the record in the light most favorable to Eaton, there is evidence that he sent text messages to his co-workers about his declining mental health and asking for help. [50] ¶¶ 42–43. Eaton came to work with a gunshot wound to his hand and admitted that he told some people that he had shot himself. [50] ¶ 45. On February 3, 2022, an anonymous caller to Walmart's Human Resources Hotline mentioned Eaton by name and disclosed that the caller had concerns about Eaton's health and the safety of associates at work. [50]

¶¶ 55–56, 58.[17] Finally, Eaton came to work after being directed not to come. [50] ¶¶ 53–54. These facts are supported by undisputed evidence in the record and show that Eaton was not meeting Walmart's legitimate expectations of how an employee should act in the workplace and that his supervisors fired him for that reason. *See* [41] at 167 (¶ 14); [41] at 178 (¶¶ 7, 9–10). This is not an evaluation, good or bad, of Walmart's response to Eaton's mental health crisis. *See Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("It is not the role of the court to determine whether an employer's expectations were fair, prudent, or reasonable."). The determinative question for Eaton's claims is whether Walmart fired him because of his race and the evidence in the record is that Eaton's supervisors deemed Eaton's behavior at work to be inappropriate and terminated his employment for that reason, not because of his race.

### 3.    *Pretext*

Finally, there is no evidence in the record that Eaton's supervisors did not honestly believe that Eaton was not meeting Walmart's legitimate expectations regarding timeliness and appropriate behavior at work. *See Barnes-Staples v. Carnahan*, 88 F.4th 712, 716 (7th Cir. 2023) ("If [the employer] honestly believed it made the correct employment decision—even if its decision was inaccurate, unfair, foolish, trivial, or baseless—[plaintiff's] claims cannot succeed.") (cleaned up). Eaton has not pointed to any evidence that his supervisors were lying when they terminated

---

[17] I note that the record does not support assertions that Eaton threatened to bring a gun to work or that he sent "threatening" text messages.

15

his employment for being late to work and failing to behave in what they perceived as an appropriate manner at work.

There is insufficient evidence in the record for a jury to find that Walmart fired Eaton because of his race, so summary judgment is appropriate for Walmart on Eaton's discrimination claims.

### B. Counts III and V – Harassment Based on Race

Eaton brings claims for race-based harassment under Title VII and Section 1981; both claims require Eaton to show that "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Paschall v. Tube Processing Corp.*, 28 F. 4th 805, 813–14 (7th Cir. 2022) (cleaned up). The harassment need not be "explicitly racial," but Eaton must show that the harassment had a racial character or purpose. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). Whether bad behavior creates a hostile work environment also depends on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (citation omitted).

#### 1. *Friedrich's Comments*

To the extent that Eaton seeks to rely on Friedrich's comments about Medicaid and slavery to show a hostile work environment, those comments are not sufficient

16

to show "severe or pervasive" harassment. I accept that Eaton perceived the Medicaid comment to be racialized and even that an objective observer could discern a racial nature to the comment—there are long-standing, false, stereotypes about African Americans and the use of state aid. Friedrich's apology for slavery, no matter how well intentioned, is also connected to race and could make an objective employee feel humiliated or uncomfortable.

But neither comment is severe enough to constitute a hostile work environment—they do not threaten violence or use dehumanizing slurs. *See Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 640–41 (7th Cir. 2019). Nor are two such comments alone pervasive enough to change the conditions of Eaton's employment. *See, for example, Singh v. Town of Mount Pleasant*, 172 Fed. App'x 675, 681 (7th Cir. 2006) (Two "unenlightened and condescending" remarks are insufficient to create a hostile work environment). To the extent that Eaton's harassment claim is based on Friedrich's comments, a reasonable jury could not find that the comments created a hostile work environment and summary judgment is appropriate for Walmart.

### 2. Harassment

Eaton also complained about harassment by a dentist and assistant center administrator. [50] ¶¶ 35–38; [57] ¶ 67. But there is no evidence in the record to support the inference that their harassment was at all connected to race. *See* [50] ¶ 36. Eaton argues that the two individuals were harassing at the behest of white supervisors, *see* [50] ¶ 39, but the evidence Eaton cites does not support a connection

17

between the two employees and white supervisors. *See* [52-1] at 14–17 (email from Eaton to supervisors detailing dentist's unprofessional conduct and harassment, does not mention racial harassment or connection to white supervisors).[18]

Reviewing the record as a whole, Eaton complained about the two employees harassing him, but his account of the behavior is about "abrasive behavior," "harassing and bullying me," and the dentist's request of Eaton to perform certain procedures. *See* [41] at 134–35 (November 2021 email from Eaton to Walmart Ethics); [41] at 137–38 (January 2022 complaint from Eaton about dentist being rude, threatening Eaton to "square up," and failing to communicate). Eaton mentions the word "racism" in his texts and emails but does not explain how the other employees' treatment of him was connected to his race. *See* [41] at 134, 153. At summary judgment, Eaton must provide some evidence upon which a reasonable jury could determine that the "harassment had a racial character or purpose"; he cannot rely solely on his subjective belief. *Yancick*, 653 F.3d at 544, 548; *Paschall*, 28 F.4th at 814. As such, summary judgment is appropriate for defendant on Eaton's Title VII and Section 1981 harassment claims.

## C.  Count VI – Retaliation

A retaliation claim requires Eaton to "show that he engaged in statutorily protected activity, he suffered a materially adverse employment action, and there was a causal connection between the two." *Xiong v. Bd. of Regents of Univ. of Wisconsin*

---

[18] Eaton cites to an assertion in his declaration that the assistant center administrator told him that she learned her discriminatory behavior from supervisors, [52-1] at 23, but that is inadmissible hearsay, so it cannot be relied on at summary judgment.

*Sys.*, 62 F.4th 350, 354–55 (7th Cir. 2023) (Title VII); *Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 752–53 (7th Cir. 2018) (Section 1981). For both Title VII and Section 1981 retaliation claims, the plaintiff must show that "but for" the protected activity the employer would not have taken the materially adverse action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (Title VII); *Comcast Corp.*, 140 S.Ct. at 1019 (Section 1981). In his brief, Eaton refers to his complaint's allegations, which encompass his complaint about Friedrich's comment, the ensuing disciplinary actions from Friedrich and Czwornog, being treated differently than another hygienist with a hand injury, and being told not to come into work. *See, for example,* [48] at 16 (referencing paragraphs 13–14, 20, 26, 28 and 30 of his complaint). Eaton also brings claims of retaliatory harassment and retaliatory discharge, discussed below.

    1.    *Protected Activity*

Eaton engaged in protected activity in February 2021 when he made a complaint of racial discrimination to Walmart HR about Friedrich's suggestion to look into public aid, specifically stating that "as an African American I was asked by the overall administrator to investigate options of getting on welfare." [41] at 124; [50] ¶ 21. Complaining about a perceived discriminatory comment is protected activity, even if a court later determines that the comment is not discriminatory. *See Brooks v. City of Kankakee*, 7 F.4th 649, 660–61 (7th Cir. 2021).

Friedrich issued Eaton a first-step disciplinary action in April 2021 because Eaton reportedly refused to cover for a dental assistant and stated that he had to take his lunch even though his lunch was scheduled for a different time. [41] at 100–101.

19

A documented reprimand, even one that puts an employee on the first step towards termination, is not an adverse action for a retaliation claim unless there is an associated "tangible job consequence." *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023). There is no evidence in the record that the April 2021 disciplinary action resulted in lower pay or some other "tangible job consequence," so it cannot be the basis of a retaliation claim. The same holds true for any retaliation claim based on Czwornog's November 2021 and January 2022 disciplinary actions.

### 2. *January 2022 Leave Without Pay*

Finally, Eaton asserts that Walmart retaliated against him by not giving the opportunity to work in a different role at full pay when he had a hand injury. Eaton was directed to request medical leave, which would not give him full pay, and another dental hygienist came to work with a hand injury and was allowed to work full time at full pay. [50] ¶¶ 46, 48.

In addition to his February 2021 email complaining of race discrimination, Eaton filed an EEOC charge in July 2021, which complained of racial discrimination by Friedrich. [50] ¶¶ 29–32. Filing an EEOC charge "is the most obvious form of statutorily protected activity." *McHale v. McDonough*, 41 F.4th 866, 872 (7th Cir. 2022) (citation omitted). As discussed above, nothing about Eaton's complaints regarding the harassment from the dentist and assistant center administrator mentioned race, *see* [50] ¶ 36, so those complaints are not protected activity.

But Eaton's retaliation claim fails on causation. Walmart submits, through a footnote to one of its statements of fact, evidence that at the time the other hygienist

was injured there was an open clerical role that was not available at the time Eaton was injured. *See* [50] ¶ 48 n.3; [41] at 166 (¶¶ 7–8).[19] Given that evidence, there is no reasonable basis to infer that Walmart treated Eaton differently because of his protected activity; it treated him differently because there was not an open clerical role for Eaton to take.

### D. Count IV – Retaliatory Harassment

Eaton brings a claim for "retaliatory harassment," but Walmart did not address this claim separately in its brief, instead arguing that Eaton was not harassed (analyzing Friedrich's comments and that Eaton did not complain about the other employees' treatment in racial terms). *See* [39] at 18–20. Co-worker harassment can be the adverse action for retaliation claim "if the employer had actual or constructive knowledge of the harassment and failed to address the problem adequately because of the employee's protected activity." *Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996). The harassment must be "severe enough to cause a significant change in the plaintiff's employment status." *Stutler v. Illinois Dep't of Corr.*, 263 F.3d 698, 703–04 (7th Cir. 2001). And, as with any retaliation claim, there must be a basis for a reasonable factfinder to find that but-for Eaton's protected activity, the employer would have intervened. *Stutler*, 263 F.3d at 704–05.

---

[19] Eaton writes in response to this footnote that "the ethics report implies that [the other hygienist] received more favorable treatment in terms of workplace accommodations" and cites to page 149 of [41]. *See* [50] at ¶ 55. Nothing in the cited document controverts that there was an open clerical role when the other hygienist was injured and no such role was open when Eaton was injured, so the fact is undisputed.

Eaton felt he was being harassed by two co-workers and he informed Walmart's HR department about the treatment. *See* [50] ¶¶ 43, 35, 37–38; [57] ¶¶ 67, 75–76. Taking the facts in the light most favorable to Eaton, it is possible that a jury could find that the co-workers' treatment of him rose to the level of a hostile work environment, but there is no evidence in the record that Eaton's supervisors failed to intervene *because of* Eaton's protected activity. The only evidence in the record is that the harassment began in the fall of 2021, after Eaton had engaged in protected activity. *See* [50] ¶¶ 21, 29, 39. Suspicious timing, standing alone, is insufficient evidence of retaliatory intent at summary judgment. *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). There is no other evidence in the record to support an inference that Eaton's supervisors failed to intervene because of Eaton's protected activity, so his retaliatory harassment claim fails.

### E.     Count VII – Retaliatory Discharge

Eaton's claim for retaliatory discharge cannot move forward for the same reason that his racial discrimination claim fails—Walmart had a legitimate, non-discriminatory reason for terminating his employment and Eaton has not shown any evidence that Walmart was lying about the reason. While Eaton's protected activity need not be the "only" cause of the adverse action, there must be a basis for a reasonable jury to find that if Eaton had not engaged in protected activity, he would not have been terminated. *See Xiong*, 62 F.4th at 355. Eaton has not pointed to any evidence to suggest that his complaints about race discrimination or filing of an EEOC charge were considered when Walmart made the decision to terminate his

employment. Neither has he offered any evidence that his supervisors did not honestly believe that he had a persistent problem showing up on time and had engaged in inappropriate behavior at work. For that reason, summary judgment is appropriate on Eaton's retaliatory discharge claim.

## IV. Conclusion

Walmart's motion for summary judgment, [38] is granted. Enter judgment for defendant and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: April 11, 2024